(132 So. 352)

**WHITAKER v. PAILET et al.**

No. 30180.

Jan. 5, 1931.

H. L. Hammett, of New Orleans, for appellant.

Sol Weiss, of New Orleans, for appellees.

OVERTON, J.

This is a suit to cancel and annul a contract to sell certain real property, located near the shores of Lake Pontchartrain, in the parish of Jefferson, and to recover $6,432, alleged to have been paid under the contract. The ground relied upon for annulling the contract is fraud.

Prior to the execution of the contract, another contract was entered into by Elias and Lester Pailet, the defendants herein, with one Gilbert Hull, through Levy and Kahn, two real estate agents, by which the Pailets bound themselves to sell the property to Hull, upon his making certain payments to them, which would constitute the purchase price. Levy and Kahn represented to Whitaker that Hull had defaulted in his payments, and that they were in position to give him the benefits of Hull's contract. According to Whitaker's version of the transaction, Levy and Kahn represented to him that Hull had paid $6,250 on his contract, and that his equity therein could be obtained for $4,204 and 150 shares of certain stock, which it appears had no value, and besides represented that they could sell the property for him in a few days at a profit of $5,000.

Whitaker apparently seemed inclined to enter into a contract to purchase the land, and Levy and Kahn notified Elias Pailet that they had the land sold, and made arrangements for him to meet Whitaker. At the appointed time Whitaker and Elias Pailet, who were on very friendly terms, met. Pailet brought with him a contract to sell, prepared in duplicate, in which it appears that his son, Lester Pailet, who, with his father, is made

defendant herein, is the proposed vendor and Whitaker the proposed vendee. In answer to an inquiry concerning the insertion of the son's name, instead of the father's, as vendor, the father replied that, while the land belonged to him, it was placed of record, as a matter of convenience, in his son's name. According to Whitaker, he then said that he depended entirely upon Pailet, and asked him whether everything was all right, which inquiry Pailet answered in the affirmative. The contract was then signed, Whitaker signing in person and Lester Pailet through his father. The contract contains a clause, reading as follows:

"The party of the second part (Whitaker) agrees to purchase and does purchase the above described property for the sum of fifteen thousand and no/100 dollars, in the manner following, to wit: six thousand two hundred and fifty and no/100 dollars paid in cash on the execution of this contract, and the balance of eight thousand seven hundred and fifty and no/100 dollars in 48 consecutive monthly installments of 182 dollars each, beginning on the 8th day of Dec. 1926, and each and every month thereafter until the whole balance of the aforesaid purchase price is paid. The party of the second part shall have the right to anticipate payments, in whole or in part, at any time before their respective maturities."

There is another clause, following the foregoing, in which Lester Pailet binds himself, upon payment of the entire purchase price, as stipulated in the contract, to deliver to Whitaker a good and sufficient warranty title to the property.

Immediately after the signing of the contract, Whitaker drew two checks in favor of Hull, one for $3,004 and the other for $1,200, with the acquiescence of Elias Pailet, and also a third in favor of Levy and Kahn for $200, probably as commission due them on the transaction, and delivered the checks together with 150 shares of stock, to Levy and Kahn. The checks were paid in the regular course of business. Elias Pailet, who was the owner of the property, received, so he testified, no part of their proceeds. It does not appear whether Hull transferred all or a part of the proceeds of the checks to Levy and Kahn or not.

When the first monthly installment fell due, Whitaker went to Lester Pailet to pay it. Pailet referred him to his father, upon the ground that his father was the owner of the property, and was handling the matter. Whitaker then went to Lester Pailet's father and made the payment. Before the next payment fell due, or was made, Whitaker learned from Elias Pailet that Hull had paid nothing on his contract, and therefore that the representation that Levy and Kahn had made that he had was untrue.

The ground upon which Whitaker seeks to annul the contract because of fraud is that Elias Pailet, at the time of the execution of the instrument, represented to him that the contract was all right, and because of the representation that Hull had paid $6,250 on his contract, when he had not done so.

There is evidence in the record tending strongly to show that at the time of the execution of the contract $15,000 was not an excessive price for the land, although all that Pailet expected to receive net for it was $8,750. Therefore it may well be that Pailet, in expressing his opinion, concerning the contract to the effect that the contract was "all right," considered that the price to be paid was not unfair, and that it was a matter of no consequence to Whitaker what became of $6,250 of the $15,000 he was about to obligate

himself to pay for the land, which he, a few moments later, did obligate himself to pay for it.

The representation that Hull had paid $6,250 of the price he had agreed to pay for the land, which was presumably $15,000, neither added to nor detracted from the liability that Whitaker was contracting to pay for it, nor did the representation add to or detract from the value of the property. It could make no difference to Whitaker whether Hull had paid $6,250 under his contract or not. Whitaker was not ignorant of the value of real property. While not engaged in the real estate business, he, in connection with his profession as a lawyer, dealt largely in notes, including mortgage notes on real property, and was familiar with the value of real estate, in New Orleans and vicinity. Not long prior to the present transaction Elias Pailet desired to borrow a large sum from Whitaker on property, of which the property, here involved, formed part, and took Whitaker to inspect the property. During the course of the negotiations Whitaker was reminded of that visit. He therefore had knowledge of the property.

■ The record impresses us that Whitaker was not, and could not have been, reasonably influenced, in entering into the contract, by the representation that Hull had paid $6,250, on the price which he had agreed to pay, but, in entering into it, was acting upon his own judgment as to the value of the property. At that time the prices of land in the vicinity, where the land here involved was located, were rapidly ascending and Whitaker hoped to realize a handsome profit in a short time out of the speculation, but was disappointed in

that, probably due to the collapse of values. In these circumstances the contract should not be annulled for fraud.

It is also urged by Whitaker that the contract should be cancelled, because it has automatically ceased to exist by his failure to continue to pay the monthly installments.

■ The contract, without referring to the right to sue upon the failure to make the monthly payments, reads that, upon such failure, it shall be treated as abrogated, with no right on the part of the vendee to claim either the amount paid or the property. This is a penal clause. The purpose of it is to give to the vendor the right to declare the contract forfeited and to retain the amount paid, instead of limiting him to a suit on the contract. The right to sue flows from the law. Article 2124 of the Civil Code provides that: "The creditor, instead of exacting the penalty stipulated from the debtor, who is in default, may sue for the execution of the principal obligation." The right given by the contract to declare the abrogation is one intended to be exercised by the creditor and not by the debtor, or at his instance. The failure of defendants to reconvene for the balance of the purchase price is not an admission that the contract has been abrogated.

The trial court nonsuited Whitaker's demands, finding the evidence insufficient to sustain them. The appellees have not asked for any change in the judgment.

Since the appeal has been lodged in this court, Whitaker has died, but his executrix has been made a party to the appeal in his place.

The judgment appealed from is affirmed.